1  Frank S. Moore, SBN 158029
LAW OFFICES OF FRANK S. MOORE, APC
2  235 Montgomery Street, Suite 854
San Francisco, CA 94104
3  Telephone:     (415) 292-6091
Facsimile:      (415) 292-6694
4  fsmoore@pacbell.net

5  Attorneys for Plaintiff GARY WILLIAMS, JR.

6

7

8

9

IN THE UNITED STATES DISTRICT COURT

10

FOR THE NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

11

12  GARY WILLIAMS, JR.,                              )   No.
                                                     )
            Plaintiff,                               )   **COMPLAINT FOR DAMAGES AND**
13                                                   )   **DECLARATORY/INJUNCTIVE RELIEF**
            vs.                                      )
14                                                   )   1.    Violation of Section 601 of Title VI of the Civil Rights Act
    BOARD OF TRUSTEES OF THE                         )         of 1964
15  CALIFORNIA STATE UNIVERSITY, SAN                 )
    JOSÉ, DAVID WOJCIK, in his individual            )   2.    Violation of Title IX of the United States Education
16  capacity, TYLER OJANEN, in his individual        )         Amendments of 1972
    capacity, AND DOES 1 THROUGH 50,                 )
17  INCLUSIVE,                                       )   3.    Violation of 42 U.S.C. Section 1983 – 14th Amendment to the
                                                     )         U.S. Constitution
18          Defendants.                              )
                                                     )   4.    Violation of 42 U.S.C. Section 1983 – 1st Amendment to the
19  _____ /             U.S. Constitution

20                                                       5.    Violation of 42 U.S.C. Section 1981

21                                                       6.    42 U.S.C. Section 1985(3) – Conspiracy to Violate Equal
                                                               Protection of the Laws and/or Equal Privileges and
22                                                             Immunities under the Laws

23                                                       7.    Intentional Infliction of Emotional Distress

24                                                       8.    Negligent Infliction of Emotional Distress

25                                                       9.    Conversion

26                                                       10.   Violation of Unruh Civil Rights Act – Civil Code §§ 51, 51.5

27                                                       11.   Violation of Mandatory Duties – Govt. Code § 815.6

28

_WILLIAMS v. BOARD OF TRUSTEES OF THE CALIFORNIA STATE UNIVERSITY, SAN JOSÈ, et al._                1

1    COMES NOW GARY WILLIAMS, JR., who complains against defendants, and each of

2  them, and alleges as follows:

3                                              **JURISDICTION**

4    1.    This action arises under Section 601 of Title VI of the Civil Rights Act of 1964, Title

5  IX of the United States Education Amendments of 1972 and 42 U.S.C. sections 1981, 1983 and

6  1985(3).  Jurisdiction is conferred pursuant to Title 28 of the United States Code §§ 1331 and 1343.

7  The pendent state claims contained within this Complaint arise from the same nucleus of operative

8  facts, and involve substantially identical issues of fact and law, such that the entire action constitutes

9  a single case which ordinarily would be prosecuted in one proceeding.  The court has pendent

10  jurisdiction over plaintiff's state claims and supplemental jurisdiction pursuant to 28 U.S.C. § 1367

11  if defendant BOARD OF TRUSTEES OF THE CALIFORNIA STATE UNIVERSITY consents,

12  which is expressly requested herein, and if not, plaintiff requests that pendent state claims be

13  remanded to the Superior Court of Santa Clara County.  Plaintiff seeks damages, costs of suit and

14  reasonable attorneys' fees.

15                                                 **VENUE**

16    2.    The claims alleged herein arose in San José, Santa Clara County.  Venue of this

17  action lies in the United States District Court for the Northern District of California, San José

18  Division pursuant to 28 U.S.C. § 1391(b)(2).

19                                               **PARTIES**

20    3.    Plaintiff GARY WILLIAMS, JR. is, and at all relevant times herein, was before the

21  filing of this action, an African American student at San José State University which is within, a part

22  of, and subject to the jurisdiction and control of, defendant BOARD OF TRUSTEES OF THE

23  CALIFORNIA STATE UNIVERSITY ("SAN JOSÉ STATE").  Plaintiff is a resident of Vallejo,

24  California.

25    4.    At all times herein mentioned, defendant DAVID WOJCIK was the Head basketball

26  coach for the San José State University's men's basketball team until July 10, 2017. Defendant

27  DAVID WOJCIK is named herein as a defendant solely in his individual capacity.

28

---

*WILLIAMS v. BOARD OF TRUSTEES OF THE CALIFORNIA STATE UNIVERSITY, SAN JOSÈ, et al.*                    2

5.      At all times herein mentioned, defendant TYLER OJANEN was the Assistant Coach basketball coach for the San José State University's men's basketball team. Defendant TYLER OJANEN  is named herein as a defendant solely in his individual capacity

6.      Defendant SAN JOSÉ STATE is organized and operating under the laws of the State of California, is a political subdivision of the State of California, and received federal financial assistance, within the meaning of 20 U.S.C.A. § 1681(a), both generally and specifically with respect to the programs and activities at SAN JOSÉ STATE and is a recipient of state education funding. At all times herein mentioned, defendants SAN JOSÈ STATE, and DOES ONE through FIVE, owned, entrusted, rented, leased, furnished, supplied, serviced, operated, managed, supervised, maintained, and controlled the San José State University campus as well as its coaches and assistant coaches.  At all times herein mentioned, defendants SAN JOSÈ STATE, and DOES ONE through FIVE, were public entities.

7.      At all times herein mentioned, defendants Head Coach DAVID WOJCIK and DOES SIX through TEN were agents, servants, employees, partners, alter egos or joint venturers of SAN JOSÈ STATE and San José State University and were at all times acting within the course, scope, and authority of said agency, service, employment, partnership, alter ego relationship, or joint venture.

8.      At all times herein mentioned, defendants Assistant Coach TYLER OJANEN and DOES ELEVEN through FIFTEEN were agents, servants, employees, partners, alter egos or joint venturers of SAN JOSÈ STATE and San José State University and were at all times acting within the course, scope, and authority of said agency, service, employment, partnership, alter ego relationship, or joint venture.

9.      Defendant SAN JOSÈ STATE, by and through its Board of Trustees of the California State University, and the defendants sued individually in this lawsuit, were and are responsible for creating and maintaining an educational environment that is free from discrimination and harassment. These defendants were and are also responsible for making policy and/or for implementing training, reporting, disciplinary, anti-harassment, and anti-discrimination policies. Further, these defendants were and are responsible for enforcing and ensuring that their

1  subordinates, agents, and employees were and are enforcing such laws and policies by taking prompt

2  remedial action in response to incidents of inappropriate behavior, harassment and/or discrimination

3  against students.

4      10.    Plaintiff is ignorant of the true names and capacities of DOES 1 through 50 herein

5  that include, but are not limited to, employees and agents of the defendant SAN JOSÈ STATE.

6  Plaintiff prays for leave of Court to insert the true names and capacities of such defendants when

7  they become known or are ascertained, together with appropriate charging allegations.

8      11.    Plaintiff is informed and believes, and thereon alleges, that defendants, and each of

9  them, were acting as agents  and employees of each other in performing the acts as hereinafter

10  alleged, and at all such times were acting within the course and  scope of such agency and/or

11  employment.

12                          **STATEMENT OF FACTS**

13      12.    San José State University has a long history of strained racial relations on its campus.

14  In the 1960s, John Carlos and Tommie Smith won NCAA national championships which propelled

15  them to later set Olympic sprint records.  These individuals' experiences as African American

16  athletes in the United States fostered the politics to compel them to bow their heads and raise their

17  fists in protest while "The Star-Spangled Banner" was played at the Mexico City Games in 1968.

18  Both athletes were booed by the audience for making the gesture and vilified by the news media.

19  Each received over a hundred death threats.

20      13.    Another San José State University alum, Dr. Harry Edwards, combined anti-racist

21  militancy with sociology and sports, that led to the formation of the Olympic Project for Human

22  Rights. San José State University alum Ron Davis – who served on the 1962 Spartan cross country

23  team squad that won the NCAA Championship and the 1961 team that finished second –

24  demonstrated that athletic excellence could be used as leverage to fight for dignity and make history.

25  San José State University alum Lee Evans won AAU and NCAA titles in his signature 400-meter

26  race for the San José State University track team. At the 1968 Olympic Games in Mexico City, he

27  earned gold medals with world-record times in the 400-meter and the 4-by-400 relay events.

28

14.     On October 17, 2005, the 37th anniversary of the event, San José State University erected 23-foot-tall statues of Tommie Smith and John Carlos that stand in the middle of campus. San José State University touts itself on its website as a "national leader in graduating minority students."

15.     Despite this legacy, San José State University was sued by its former cross-country coach Ron Davis, the same Ron Davis mentioned above who was a part of those historic teams of the 1960s and a member of the school's athletic hall of fame, who claimed racial bias and discrimination led to his firing in 2013. Ron Davis was fired after San José State University hired former Boise State University athletic director Gene Bleymaier as the university's new athletic director effective June 30, 2012.  Prior to his hiring by San José State University, on August 11, 2011, Boise State University president Bob Kustra fired Bleymaier following an NCAA investigation involving 22 rules violations by the Boise State women's tennis, men's tennis, track and field, and football programs. The following month, the NCAA placed Boise State University on three years of probation and reduced football scholarships, among other sanctions.

16.     In March 2013, Bleymaier fired San José State Spartans men's basketball team head coach George Nessman and hired Boise State University assistant coach defendant DAVID WOJCIK to replace Nessman.  Bleymaier was athletic director at Boise State University when defendant DAVID WOJCIK became associate head coach at Boise State University until 2012. Bleymaier recently serves as special advisor to the president at San José State University.

17.     Another racially charged event occurred at San José State University in November 2013. Caucasian SJSU students, Colin Warren, Logan Beaschler, and Joseph "Brett" Bomgardner, along with two others, repeatedly bullied their Black roommate, Donald Williams, Jr., back in 2013. The roommates displayed a Confederate flag in their shared dorm at SJSU and referred to him as "three-fifths" and "fraction," per the 18th Century U.S. Consensus that didn't consider Blacks as fully human. In another incident, one of Donald's Caucasian roommates came up behind him and placed a U-shaped bike lock around his neck. Colin Warren, Logan Beaschler, and Joseph "Brett" Bomgardner were prosecuted and convicted of misdemeanor assault, but a jury with no African-American members deadlocked on the hate crime charge.  San José State University

conducted an internal investigation and issued an apology from the president of the university.  San

José State University created a campus task force on racial discrimination as a result of this incident.

The head of the campus task force, former Judge LaDoris Cordell, expressed disappointment verdict

and was quoted by the San Jose Mercury as follows: "I am saddened that 12 jurors could not agree

that calling a Black male 'Three-fifths' or 'Fraction,' or forcing a lock around his neck, or creating

an environment promoting racism with Confederate memorabilia, or hearing how this young man

was humiliated, amounted to a hate crime," said Cordell, who is Black. "This verdict demonstrates

that we are a long way from living in a post-racist America."

18.     Sue Martin, San José State's interim president at the time, issued a statement in

response to the verdict saying the college is working to improve the racial climate on campus. San

José State University created a new chief diversity officer position in response to the incident and

also created a Black Scholars Community in one of its residence halls and completed a survey on the

racial climate at the university. A Special Task Force on Racial Discrimination, formed in response

to the alleged hate crimes on campus, completed its work in April 2014. Chaired by the

aforementioned retired Santa Clara County Superior Court Judge LaDoris Cordell, the group

provided more than 50 recommendations to San José State which included as follows:

- Require the Center for Faculty Development to develop and provide faculty training about the  rules for civil discourse and respect in the classroom, and about understanding the strengths that diverse students bring into the classroom;
- Develop effective strategies for engaging diverse students; and
- Create a comprehensive policy that covers bias, discrimination, hate violence and bullying in consideration of CSU Executive Orders, SJSU Academic Senate Policies, Presidential Directives and other departmental policies.

19.      The same month and year (April 2014), vandals dislodged and destroyed the gold

medal that adorned the statue of Tommie Smith on campus.  San José State University's

administrative and Academic Senate leaders reviewed each recommendation from the Special Task

Force on Racial Discrimination and created an action plan to implement the aforementioned

recommendations by no later than December 2014.

20.     Dr. Harry Edwards served as San Josè State University's 2016 Commencement speaker and was bestowed an honorary Doctorate of Humane Letters at Commencement. Thereafter, San Josè State University launched the Institute for the Study of Sport, Society and Social Change, claiming it was "uniquely positioned to found the institute, given its history of using sport to advance social change."  The Institute for the Study of Sport, Society and Social Change is dedicated to research, analysis and education at the intersection of sport and society and to examine issues at the forefront of American discourse—from racism, gender equity, LGBT issues and human rights to the school to prison pipeline, performance-enhancing drugs and the concussion epidemic.

21.     It is in the context of the aforementioned events that the actions of defendants DAVID WOJCIK and TYLER OJANEN, and the inaction of the rest of the San Josè State Spartans men's basketball team's coaching staff, as alleged herein, arose.  The San Josè State Spartans men's basketball team is a varsity intercollegiate athletic team of San Josè State University. The team is a member of the Mountain West Conference, which competes in Division I of the National Collegiate Athletic Association.

22.     Plaintiff is informed and believes and thereupon alleges that defendant DAVID WOJCIK has twenty-three (23) years of experience in collegiate basketball and twenty-six (26) years of total coaching experience.  Defendant DAVID WOJCIK has been employed as the San Josè State Spartans Head Basketball Coach for the men's basketball team since 2013. He was guaranteed $258,168 as base salary on an annual basis plus $66,840 a year for engaging in personal speaking engagements, public relations appearances, "Coach's Shows" and other duties assigned by the Director of Athletics, Gene Bleymaier. Defendant DAVID WOJCIK was also eligible for additional incentive pay.  As the former Athletic Director from Boise State University, Gene Bleymaier recruited defendant DAVID WOJCIK where he had been employed by Boise State University as an Assistant Men's Basketball Coach.

23.     The San Josè State Spartans Head Basketball Coach position was defendant DAVID WOJCIK's first experience as the head coach of a college basketball team. A head coach's essential responsibility is to make decisions which include, but are not limited to, choosing assistant coaches, to recruiting athletes, arranging sports schedules, deciding which athletes will be first string, the

1   strategies to be employed, what is acceptable athlete behavior, etc.

2       24.     According to sociologists who have studied the field, the primary responsibility of

3   coaches have been characterized historically as overlapping those of the parental father.  Firm

4   discipline is expected in collegiate sports.  As such, autocratic rule by coaches is typically the norm

5   in collegiate basketball than is a pattern of interaction characterized by compromise and democratic

6   exchange.

7       25.     According to sociologists, because of the historically unchallenged authority of a

8   head coach as a surrogate father, the coach in collegiate sports has assumed the burden of

9   accountability of his players.  He has therefore demanded total authority over said athletes as a

10  reciprocal adjustment.

11      26.     The contract entered into between defendant DAVID WOJCIK and defendant SAN

12  JOSÈ STATE set forth in the California State University MPP Athletic Coach Appointment Letter

13  dated March 29, 2013, expressly identified defendant DAVID WOJCIK to be responsible for

14  evaluating, recruiting, training, developing academic and social skills, as well as coaching

15  student-athletes to compete successfully against the highest level of NCAA intercollegiate

16  competition in a quality men's basketball program.  The contract entered into between defendant

17  DAVID WOJCIK and defendant SAN JOSÈ STATE also identifies his general responsibilities to

18  include, among other items, to: "maintain reasonable discipline and be fair, empathetic and develop

19  a positive relationship with the student-athletes, while motivating them to excellence in all aspects of

20  life, including athletic and non-athletic endeavors"; "make every effort, working in cooperation with

21  and support of athletics department's administrative and support officials to ensure that all student

22  athletes' academic and general welfare issues are addressed"; "recruit exceptional high school

23  prospective student-athletes who have a reasonable opportunity to gain a degree from San Josè State

24  University and manage the team's roster in a manner that conforms to the department's stated

25  policies regarding squad size, out-of-state residents and junior college and four year institution

26  transfers"; "work to integrate intercollegiate athletics into the whole spectrum of academic life to

27  complement the University and its mission in the community"; "maintain a professional, collegial,

28  mature and rational demeanor and attitude at all times"; "work within the confines of all rules,

regulations, guidelines, policies and procedures of the athletics department and to ensure that those staff members within his charge do so as well"; "have complete knowledge of the NCAA and conference rules and regulations and maintain strict compliance as well as attend all department rules education meetings unless the Director of Athletics or his designee gives prior approval for Employee's absence from such meetings"; "advance the efforts of the Department of Athletics and the University toward diversity and gender equity" and "fully support and abide by the CSU and San Josè State University's commitment to gender equity in education, including athletics, and its full compliance with Title IX of the Education Amendments to the Civil Rights Act of 1964"; "fully support and abide by CSU and San Josè State University's commitment to maintain a working and learning environment where every student, employee and community member is treated with dignity and respect"; and support and comply with San Josè State University's commitment to maintain a safe and healthy living and learning environment for everyone".

27.     Plaintiff is informed and believes and thereupon alleges that, in addition to the duties and responsibilities assigned to defendant DAVID WOJCIK in the California State University MPP Athletic Coach Appointment Letter dated March 29, 2013, other duties were further outlined in the Position Description provided with the Appointment Letter to include, but not limited to: "a positive, energetic leader with the ability to teach, motivate and recruit student-athletes"; "budget management"; "hiring and supervising assistant coaches"; "developing positive relationships with faculty, staff, students, media, alumni and boosters while interacting successfully with department personnel and the University community"; "promote an environment that fosters individual and team development"; "operate the sport program with integrity and within the scope and intent of NCAA, conference, department and university regulations"; "hire, train, evaluate, supervise and mentor assistant coaches and support staff"; "manage designated resources within budgeted allocations, according to university and department procedures and in a responsible manner"; "comply with all Mountain West Conference and department policies that relate to travel and budget"; "be a professional representative of SJSU and a role model for the student athletes, the department and community"; "foster a positive environment that encourages and supports sportsmanship"; and adhere "to University compliance training such as: Conflict of Interest and Ethics, AB 1825 Sexual

Harassment Prevention, Information Security, and Injury and Illness Prevention Program."

28.     Pursuant to the terms of the California State University MPP Athletic Coach Appointment Letter dated March 29, 2013, defendant DAVID WOJCIK reported to the Director of Athletics (Gene Bleymaier) or his designee. Defendant DAVID WOJCIK's job duties and responsibilities were required to be reviewed, revised and assigned from time to time by his reporting superior, whether it is the Director of Athletics or his designee.

29.     As San Josè State Spartans Head Basketball Coach, defendant DAVID WOJCIK's position was within the CSU – Management Personnel Plan (MPP), and he served at the pleasure of the President of San Josè State University in the category of Definite Term Athletic Appointments, one of the four grade levels under CSU's MPP. MPP athletic personnel (coaches and athletic directors) remain subject to the terms and conditions of the MPP (e.g., reassignment and non-retention).

30.     During defendant DAVID WOJCIK's tenure and his coaching staff's tenure, they were bound by Executive Order 1097 Revised June 23, 2015, superseded by CSU Executive Order 1097 Revised October 5, 2016, in conjunction with Executive Order 1095 Revised June 23, 2015. Those Executive Orders identify prohibited conduct to include discrimination, including harassment, because of any Protected Status: *i.e.,* age, disability (physical and mental), gender (or sex), gender identity (including transgender), gender expression, genetic information, marital status, medical condition, nationality, race or ethnicity (including color or ancestry), religion (or religious creed), sexual orientation, sex stereotype, and Veteran or Military Status including retaliation for exercising rights under the Executive Orders, opposing discrimination or harassment because of a protected status, or for participating in any manner in any related investigation or proceeding, among other things.

31.     In defendant DAVID WOJCIK's inaugural season as Head Basketball Coach, the San Josè State Spartans men's basketball team were first year members of the Mountain West Conference. They finished the 2013-2014 season 7–24, 1–17 in Mountain West play to finish in last place. They lost in the first round of the Mountain West Conference Tournament to Boise State.  The San Josè State Spartans men's basketball team finished the 2014-2015 season 2–28, 0–18 in

Mountain West play to finish in last place. During the season, the Spartans were invited and participated in the Wooden Legacy in Anaheim, California. They earned last place from not defeating any team they were against in the tournament. They failed to defeat a Division I opponent.

32.     Plaintiff attended San Josè State University for his last two years of post-secondary education during the 2015-2017 academic school years.  Plaintiff is African American.  Plaintiff graduated from Castlemont Hight School in Oakland, California, and was senior class President. Plaintiff was recruited by defendant SAN JOSÈ STATE through defendants DAVID WOJCIK and Assistant Coach TYLER OJANEN from Indian Hills Community College in Iowa where plaintiff was Junior College All-American in Basketball, Academic All-American and on the Dean's list. Plaintiff was also voted "fan Favorite" at Indian Hills Community College.

33.     Plaintiff visited San Josè State University with his father in 2014 as part of the recruitment process.  Defendant DAVID WOJCIK and other San Josè State University men's basketball team assistant coaches and staff greeted plaintiff and his father.  Plaintiff and his father were shown the dorms where it was represented plaintiff would be staying the following year if he chose to attend San Josè State University.  That representation ended up being incorrect.  Plaintiff later found out that current Spartans men's basketball team players were asked to go along with the representation of the dorm facilities to entice the recruits to play there.  Plaintiff and his father were shown a game film and were told that the type of play depicted in the film was how the Spartans played and proposals on how plaintiff could be utilized on the team if he chose to attend.

34.     Plaintiff had received offers from other schools but his father persuaded him to attend San Josè State University based on the representations made by defendant DAVID WOJCIK, the proximity of San Josè to his home and a full athletic scholarship. Defendant DAVID WOJCIK convinced plaintiff that he would help him get to the next level of basketball play which would assist him in establishing statistics reflecting performance as a basketball player.

35.     Before plaintiff attended San Josè State, he learned of an academic ban that was placed on San Josè State University's basketball program.  San Josè State basketball received a post season ban for posting a low academic progress score (APR) for the 2012-2013 season with the following NCAA imposed sanctions:

1    ● No post-season competition including the 2015 Mountain West Championship.

2    ● Replacing 4 hours of weekly practice time with 4 additional hours of academic

3    activities.

4    ● Five days of basketball-related activities per week instead of six.

5    36.    Plaintiff is informed and believes and thereupon alleges that San Josè State basketball

6    posted a low APR for the 2013-2014 season which extended a post season ban for the 2014-2015

7    season.  Plaintiff was informed by Assistant Coach TYLER OJANEN that there wasn't a current ban

8    when he was being recruited.  This was false.  Plaintiff found out after he accepted the offer to play

9    for San Josè State University's basketball program that there was a ban.  The NCAA placed sanctions

10   on San Josè State for the 2014-15 season due to an unsatisfactory Academic Progress Rate. These

11   sanctions included limited practice time and a postseason ban.

12   37.    According to sociologists who have studied the phenomena, one of the acknowledged

13   creeds of sports is that it builds good character.  The concept of building good character is primarily

14   centered on sportsmanship, reliance, perseverance, determination and a willingness to abide by rules

15   which can and has been broadened to include cleanliness, acceptable grooming, acceptable language,

16   life styles and other observable traits of behavior defined as indicative of good character in the larger

17   society.  As the least powerful component of the sports team unit, the athlete has little or no input into

18   decisions affecting most of his outcomes, including his physical safety.

19   38.    Plaintiff suffered a hip labral tear which involved the ring of cartilage (labrum) that

20   follows the outside rim of the socket of a person's hip joint in 2015 during preseason practices when

21   defendant DAVID WOJCIK routinely forced the team to run for five hours straight.  This conduct

22   was in violation of NCAA rules limiting practice times.

23   39.    In October 2015, defendant DAVID WOJCIK spoke with ESPN, who said that he was

24   determined to build a winning culture, to wit: "We're trying to build a culture there, and it takes time

25   to build that culture," Defendant DAVID WOJCIK told ESPN's Ari Wolfe. "You have to get the

26   right character kids."  Defendant DAVID WOJCIK emphasized the need to bring in recruits of good

27   character after a disciplinary crisis the previous season. Defendant DAVID WOJCIK made the

28   following statements about the plaintiff to ESPN: "He just brings size, he can score, and I just like

1   that ability because we can interchange those guys [plaintiff and teammate Princeton Onwas] a lot.

2   We can post them up; we can play them in the perimeter."

3        40.     On or about November 4, 2015, plaintiff re-injured his torn labrum during a time when

4   defendant DAVID WOJCIK yelled: "I am going to run you like slaves."  As a Black citizen, plaintiff

5   was offended by defendant DAVID WOJCIK's use of the term "slaves" as racially offensive when

6   describing this punitive action.  Plaintiff is informed and believes and thereupon alleges that other

7   Black players found the use of the term "slaves" racially offensive.  The term "slave," in the

8   historical context of the United States, does not have the same level of offense to Caucasians as it

9   does to African Americans.

10       41.     November 14, 2015, was the first game of regular season play for the 2015-2016

11  season.  After the start of the season, plaintiff began to see a different side of defendant DAVID

12  WOJCIK.  Defendant DAVID WOJCIK routinely cursed at the players as well as the assistant

13  coaches.  He used bullying tactics and threats were very common.  Defendant DAVID WOJCIK

14  called players and coaches "stupid ass," yelling at the team and staff to "shut the fuck up" and to "sit

15  the fuck down."

16       42.     Defendant DAVID WOJCIK routinely referred to two or more players as "fuck

17  buddies" or "butt buddies" if they were not paying attention to him or he was otherwise dissatisfied

18  with their performance.  For instance, he would say "hey, you two fuck buddies, you wanna pay

19  attention?"  Plaintiff is informed and believes and thereupon alleges that teammate Brandon Mitchell

20  confronted defendant DAVID WOJCIK about the offensive statements and he just smiled at him and

21  continued his conduct unabated.  Defendant DAVID WOJCIK also used the term "pussy" when he

22  wanted to indicate a player was "soft" or he would state "you play like a girl." This terminology was

23  used with numerous players on the team.  Defendant DAVID WOJCIK told one player to "stop

24  tucking your dick between your legs like a pussy." Defendant DAVID WOJCIK engaged in this

25  behavior in front of assistant coaches and staff during practice.  These comments were pervasive, a

26  form of homophobia, were intended to offend and were designed to emasculate the males defendant

27  DAVID WOJCIK directed them toward.

28

43.     Defendant DAVID WOJCIK's offensive conduct and statements took a more pointed turn against Black players.  Defendant DAVID WOJCIK humiliated the Black players including plaintiff while praising Caucasian players.  One Black player from Germany, Leon Bonner, had a 4.0 GPA and was a respectful person.  Defendant DAVID WOJCIK repeatedly humiliated him publicly and called him "stupid" and cursed at him. Defendant DAVID WOJCIK made specific reference to Leon Bonner's national origin by stating to him in front of the team: "That is why Germany lost the World War, because they are soft." Plaintiff is informed and believes and thereupon alleges that Leon Bonner quit the team due to defendant DAVID WOJCIK's conduct.

44.     Defendant DAVID WOJCIK referred to Caucasian players as "more cerebral" while referring to the Black players as "more athletic." In this context, defendant DAVID WOJCIK used the term "slave" when addressing the team. After a particularly bad loss, defendant DAVID WOJCIK was upset with the team and said either "I'm going to run you like slaves" or "work you like slaves," which plaintiff perceived to be degrading to the Black players on the team. Plaintiff is informed and believes and thereupon alleges that other Black players felt disrespected and were upset he would use the term "slaves."  Several players talked about defendant DAVID WOJCIK's use of the term "slaves" afterwards and felt he had "crossed the line." Defendant DAVID WOJCIK followed through on his threat the next day at practice and required the team to run more than they had in the past in violation of NCAA rules limiting practice times.

45.     When correcting a Caucasian player, defendant DAVID WOJCIK spoke in a manner and tone that was objectively respectful and "normal" by explaining what the player did wrong. When a Caucasian player required correction, defendant DAVID WOJCIK used the occasion as a teaching method instead of yelling at them. When correcting a Black player, defendant DAVID WOJCIK in the same situation, he would say, "aren't you smart enough to remember the play" or "are you slow?" Defendant DAVID WOJCIK used inappropriate terms towards more of the Black players than Caucasian players. Defendant DAVID WOJCIK tended to call Black players "retarded" but when referring to Caucasian players he would say they are more "cerebral." Plaintiff perceived this selective use of derogatory descriptions of Black players' mental deficiencies exhibited a belief or opinion by defendant DAVID WOJCIK that the Black players were "slower" and could not

comprehend information as well as the Caucasian players.  While defendant DAVID WOJCIK would be harsh in his criticisms of both Caucasian and Black players, he reserved the use of derogatory terms and ridicule of Black players mental abilities.  On one occasion, defendant DAVID WOJCIK grabbed with two hands team mate Jaycee Hillman by his jersey and and shook him when finding fault in his play which plaintiff found to be extremely disrespectful.  Defendant DAVID WOJCIK never treated a Caucasian player in that manner.

46.     Before practice and games, plaintiff led the team in prayers. This tradition was embraced by the team and if the plaintiff forgot or neglected to engage in it, the team would remind him to lead the prayers. Additionally, when plaintiff shoots free throws he has a ritual where he points upwards "thanking God." After observing plaintiff engage in such conduct, defendant DAVID WOJCIK mimicked plaintiff's free throw ritual and honor of God.  For example, when plaintiff was at the free throw line, defendant DAVID WOJCIK stated in front of the team "hope God helps you make this" and "do you thank God when you miss?"  In addition, if the plaintiff made a mistake, defendant DAVID WOJCIK stated to him in front of the team in a condescending tone, "can't remember the play, God needs to help you now" and "God can't help you now" and "God didn't help you remember that play." Defendant DAVID WOJCIK attempted to stop plaintiff from leading the team prayer before practice and games, but the team indicated they wanted it to continue.

47.     Observing this hostile treatment, plaintiff started to feel that the team environment was toxic and discriminating. Defendant DAVID WOJCIK's intimidation, bullying and threats to get rid of players and assistant coaches were common, and became more pointed if anyone complained.

48.     The San Josè State Spartans men's basketball team finished the 2015-2016 season 9–22, 4–14 in Mountain West play to finish in last place. They lost in the first round of the Mountain West Tournament to Colorado State.

49.     Plaintiff was provided 454 minutes of game playing time during the 2015-2016 season which placed him the 7th highest playing member of the team out of 12.  In professional basketball, the most commonly used statistical benchmark for comparing the overall value of players is called efficiency. It is a composite basketball statistic that is derived from basic individual statistics: points, rebounds, assists, steals, blocks, turnovers and shot attempts. The efficiency statistic, in theory,

accounts for both a player's offensive contributions (points, assists) and their defensive contributions (steals, blocks).  The efficiency score (EFF) is derived by a simple formula created by Kansas City sports reporter and statistician Martin Manley: (PTS + REB + AST + STL + BLK - Missed FG - Missed FT - TO) / GP.  Plaintiff's EFF score for the 2015-2016 season was 5.433, the 7th highest EFF score among his 12 team mates.

50.     Defendant DAVID WOJCIK required plaintiff to show up one hour before practice for the scout team.  The scout team usually consisted of walk-on players defendant DAVID WOJCIK would have the San Josè State Spartans men's basketball team practice against in order to learn the next game's opposing team's offence and defense. The majority of the time plaintiff was not allowed to practice with the San Josè State Spartans men's basketball team at all while the walk-on players on the scout team would rotate teams. Very sparingly at the beginning of the season when plaintiff was put into regular practice to learn plays, plaintiff was instructed by defendant DAVID WOJCIK not to touch the ball and to go to the opposite corner the ball was on and stay there.  Defendant DAVID WOJCIK made it a rule that when plaintiff was in the game or in practice, plaintiff was only allowed to bring the ball up on the right side of the floor and then go to the left corner which placed plaintiff next to defendant DAVID WOJCIK on the court's sidelines.  Plaintiff was typically not allowed to bring the ball up the court as he was instructed to go to the left side of the court while a team mate brought the ball up on the right side of the court. This rule ensured that plaintiff did not touch the ball during the play. When the ball rotated to the other side of the court on the left side, plaintiff was required to go to the right side of the court, also designed to ensure he did not touch the ball during offense.  If the ball was passed to plaintiff, the player who passed it would be yelled at furiously by defendant DAVID WOJCIK.  When plaintiff moved out of the corner even to rebound, defendant DAVID WOJCIK yelled at him and took him out of the game.  When plaintiff was occasionally placed on the scout team, defendant DAVID WOJCIK often yelled and cursed plaintiff, going out of his way to embarrass him.

51.     November 1, 2016, was the first game of regular season play for the 2016-2017 season.  Plaintiff did not play the first two games of the 2016-2017 season due to a re-injured labrum tear.

52.     No longer being able to practice, a doctor's appointment was scheduled for plaintiff and a cortisone shot was prescribed.  On November 10, 2016, plaintiff's doctor called the San Josè State men's basketball trainer and told him that he had an open appointment for that afternoon but that plaintiff would have to miss practice to make the appointment.  Missing practice should not have been an issue since plaintiff had not been able to participate in practices since his injury on November 4, 2016.  San Josè State men's basketball trainer was informed that if he declined the appointment, he would not have been able to be seen by the doctor for another week.  When the trainer relayed the message to plaintiff and defendant DAVID WOJCIK what the doctor had shared with him and suggested that he take him to the doctor, defendant DAVID WOJCIK became irate, and began cursing out the trainer and the assistant coaches, asking an assistant coach, "why did his fat ass schedule the appointment during the practices."  The trainer had already explained that it was the first appointment that could be given until the following week.  Even though plaintiff needed urgent medical attention because he was in excruciating pain, defendant DAVID WOJCIK did not allow any of his staff (which included three assistant coaches/trainer and a director of operations) to drive plaintiff to his appointment. The trainer went on to explain to defendant DAVID WOJCIK that plaintiff was not participating in practice anyway due to the injury and that he (the trainer) was available to drive plaintiff to doctor's office.  Defendant DAVID WOJCIK refused to allow the trainer to leave in order to escort plaintiff to the doctor's appointment.

53.     Defendant DAVID WOJCIK's refusal to allow plaintiff to make the first available doctor's appointment would delay his receiving a cortisone shot and placed him at risk for prolonged pain which continued to afflict him and placed plaintiff in the situation where he would continue to miss more games and practices due to the untreated injury.  This caused plaintiff great distress and alienation, but he persevered and he drove himself to the doctor's office.  Plaintiff received the cortisone shot and had to drive himself back but he felt dizzy on the way home and had to pull over.

54.     In his first regular season play for the 2016-2017 season against the University of Portland on November 15, 2016, plaintiff played 4 minutes and he scored 2 points and had 1 rebound. The next game against Denver on November 17, 2016, plaintiff played 12 minutes but did not score or rebound.

55.     On November 22, 2016, in a nationally televised game against St. Mary's University, plaintiff was not played at all.  This became routine wherein plaintiff was denied the opportunity to play or played minimally during nationally televised games.

56.     On November 22, 2016, defendant DAVID WOJCIK let a player start the nationally televised game against St. Mary's who was returning from suspension for a failed drug test for cocaine.  This Caucasian player's contribution to scoring and rebounding during this game was minimal which resulted in an 81 to 64 loss.  The reason for this Caucasian player's suspension was covered up by defendant DAVID WOJCIK through false reports that he was injured.  By contrast, in December 2014, five Black players were suspended for engaging in marijuana use (violating team rules), and two of these five Black players (the team's second and third-leading scorers) were subsequently expelled from the team and from school which received news accounts in the San Josè Mercury and other news articles.  Yet, the aforementioned Caucasian player failed two drug tests for cocaine use which was concealed, was retained on the team, allowed to finish the school year and to transfer to another university without consequence.

57.     On November 27, 2016, plaintiff was given 20 minutes of play against Washington State in which he scored 12 points for the team.  On November 29, 2016, plaintiff was played 19 minutes against the University of Idaho in which he scored 4 points.

58.     On December 3, 2016, defendant DAVID WOJCIK told plaintiff not to shoot the ball and, if he did, he would not play against Santa Clara University.  Plaintiff was provided 13 minutes of play and made 3 points solely through free-throws.

59.     On December 7, 2016, plaintiff was played 22 minutes against the University of Montana in which he scored 9 points for the team.  The press reported: "Trailing 52-34, with 15:26 left in the second half, Gary Williams, Jr., produced SJSU's first real rhythm of the game with five straight points on a 3-ball and a jumper."  The press also reported: "Williams, Jr., finished with a very loud nine points and six rebounds - seven of which helped the Spartans climb back in the second half."

60.     On December 10, 2016, SJSU was scheduled to play Life Pacific College.  Prior to this game, defendant DAVID WOJCIK told plaintiff that he would be in the starting line-up.

However, upon game time, defendant DAVID WOJCIK changed the line up.  This bait and switch would become routine.  This conduct frustrated and upset the plaintiff.  When substituted in, plaintiff was allowed 15 minutes of play against Life Pacific College.  The press reported: "Behind Schwartz's [Cody Schwartz] display from downtown, San Josè State hit a season high 13-3 pointers.  Three out of four assists for Gary Williams, Jr., came when he found Schwartz in his sweet spot beyond the arc.  Williams finished with 11 points, four rebounds and four assists."

61.     During the after game Pacific Life College interview, a reporter stated to defendant DAVID WOJCIK that plaintiff seemed to be a "spark" to the team which the coach affirmed.  Defendant DAVID WOJCIK acknowledged taking plaintiff out of the lineup and stated it was a "feel thing" between starting plaintiff or Jaycee Hillsman, but that he was starting to think plaintiff was "a little bit better off the bench for us and giving us a lift so maybe I'll lean towards that, I'll think about it more in the next week or so, but I really liked his energy coming off the bench today, for sure."

62.     Despite defendant DAVID WOJCIK's public statements on December 10, 2016, plaintiff was played 17 minutes against Bowling Green on December 18, 2016, the third lowest amount of time on the court for the team and yet he scored 10 points and had 5 rebounds.

63.     On December 21, 2016, against Southern Utah plaintiff was allowed to play 24 minutes and he scored 17 points and had 5 rebounds.  On December 28, 2016, against University of Nevada, Reno, plaintiff was allowed to play 23 minutes and he scored 14 points and had 4 rebounds.  On January 4, 2017, against Colorado State, plaintiff was allowed to play 12 minutes and he scored 4 points and had 3 rebounds.

64.     On January 7, 2017, against Fresno State, plaintiff was allowed to play 18 minutes and he scored 18 points and had 2 rebounds. The San José State Spartan website news reported:

> There were three different times in the first half when the San José State men's basketball team trailed rival Fresno State by 15 points. While the Spartans were down, they were never out and Gary Williams, Jr. matched a career-high with 18 points fueling the Spartans to a 69-62 win over the Bulldogs inside The Event Center. Williams made his fifth start of the year - his first since December 7 at Montana - and went 11-of-12 from the free throw line helping the Spartans (8-6, 1-2 MW) convert 20-of-24 as a team. All of the senior guard's free throws came in the second half and he nailed 3-of-4 in the final 16.3 seconds to secure the win.

65.     On January 10, 2017, against San Diego State, plaintiff was allowed to play 13 minutes and he scored 4 points and had 1 rebound. On January 14, 2017, against the United States Air Force Academy, plaintiff was allowed to play 17 minutes and he scored 6 points and had 1 rebound.

66.     On January 18, 2017, against the University of Wyoming, plaintiff was allowed to play 14 minutes and he scored 8 points and had 3 rebounds.  After this game loss defendant DAVID WOJCIK had a team meeting and asked the team what it thought was wrong and how they could get better.  No one on the team spoke, but plaintiff decided to speak up.  Plaintiff told defendant DAVID WOJCIK that he was the problem. Plaintiff opined that everyone else on the team was afraid to speak up so he volunteered to speak for the team.  Plaintiff explained to the coach that the team and members of the coaching staff were intimidated by him.  Plaintiff explained to defendant DAVID WOJCIK that his unnecessary yelling, cursing and throwing of things made for a very toxic environment and that his conduct and statements were offensive and demeaning. Plaintiff also explained to defendant DAVID WOJCIK he was unapproachable and after the team witnessed how disrespectful the way he spoke to his assistant coaches, no one on the team would approach him. Plaintiff went on to say that his constant yelling makes the team players nervous. Defendant DAVID WOJCIK asked the team if what plaintiff communicated was true and many members of the team expressed their agreement.   Other teammates spoke up as well, including teammate Isaac Thornton, who complained to defendant DAVID WOJCIK that he didn't like how the coach talked to the team and how he treated individual members.  Defendant DAVID WOJCIK went on to say that he would work on his yelling at the team but as for the coaches, he would continue to treat them that way because he was their boss and everyone has a boss and he's theirs and he would get rid of them if they didn't listen.

67.     Plaintiff's father, Gary Williams, also spoke with defendant DAVID WOJCIK about his concerns about plaintiff's experience with the San Josè State Spartans men's basketball team and shared with him the incidents and events that were very disturbing to plaintiff including the homophobic and racially charged statements.  Despite these entreaties, defendant DAVID WOJCIK continued his homophobic and racially charged statements.

1   68.    According to sociologists who have studied the field, it is not only within the sphere of

2   coach-athlete relations that role-related hostility and associated problems emerge.  Similar tensions

3   are found in relationships between head coaches and assistant coaches.  Because of the character of

4   the coaching role, there is an inherent potential for strain between head coaches and their assistants.

5   The head coach's paternalistic role in relation to the athlete can and does extend to assistant coaches.

6   69.    According to sociologists, because the head coach bears complete responsibility for

7   his team's outcomes, he has traditionally demanded and received total autonomy with regard to

8   managing his team.  Accordingly, the authority structure in any given sports unit has always been

9   rigid and monarchial.  Traditionally, the head coach typically refrains from the visible disciplining of

10  an assistant coach because to do so would essentially place the assistant coach in the same status

11  relationship with the head coach as exists between the head coach and his athletes.  This would tend

12  to undermine the perceived status and authority differences between athletes and assistant coaches.

13  Despite this traditional conduct of these roles, defendant DAVID WOJCIK's conduct and statements,

14  particularly the belittling and yelling, directed at his assistant coaches, was beyond tradition and was

15  an effort to undermine the assistant coaches' status and place them at or below the status of the

16  athletes on the San Josè State Spartans men's basketball team.  The San Josè State Spartans men's

17  basketball team has 3 assistant coaches and a director of operations, 3 Caucasian and 1 Black.

18  Typically, loyalty of the assistant coach to the athletic unit becomes the norm and usually precludes

19  conscious or deliberate encroachment upon the prerogatives of the head coach according to

20  sociologists who have studied the phenomena.

21  70.    After plaintiff spoke up after the January 18, 2017 game against the University of

22  Wyoming, defendant DAVID WOJCIK continued to require plaintiff to attend one hour before

23  practice but plaintiff was not allowed to practice at all and instead required to stand idle for up to four

24  hours a day without being allowed to participate, though required to do the conditioning exercises.

25  71.    On January 21, 2017, against Boise State University plaintiff was put in play very

26  sporadically in the second half with his body cold from being on the bench.  Plaintiff was taken out of

27  the game after less than a minute.  Overall, plaintiff played 5 minutes and he scored 1 point and had 2

28  rebounds. Plaintiff later  realized he suffered a bruised bone in his knee.

---

72.     Thereafter, because of plaintiff's bruised knee, he was not allowed to play against Colorado or UNLV on January 25th and 28th, 2017, respectively.  The next scheduled game was to be held on February 4, 2017, at the University of New Mexico.

73.     In the weeks practice leading up to the University of New Mexico game, plaintiff returned to participating in practice but was approached by defendant DAVID WOJCIK who suggested to plaintiff that he was not needed and should not return to the team.  Defendant DAVID WOJCIK sarcastically told plaintiff to save his knee for "getting in and out of your Maserati." Plaintiff took defendant DAVID WOJCIK's statements to mean that he no longer wanted him on the team.  Plaintiff is informed and believes and thereupon alleges that defendant DAVID WOJCIK had become aware of plaintiff's popularity on campus as an amateur rapper and that this insult was a reference to a video plaintiff had performed in that featured valuable automobiles.  Plaintiff is further informed and believes and thereupon alleges that defendant DAVID WOJCIK engaged in his own investigation of plaintiff in the hope of finding sponsors that were supporting plaintiff's budding rapper talent that would be in violation of NCAA rules.  No such sponsors existed, but plaintiff's activities as a rapper became an unusual focus of defendant DAVID WOJCIK after plaintiff complained to him about his unacceptable conduct on January 21, 2017.  Plaintiff continued to attend practice even though defendant DAVID WOJCIK told him he was no longer needed.

74.     Plaintiff was cleared to play by the time of the next game on February 7, 2017, against San Diego State and defendant DAVID WOJCIK told plaintiff to suit up for the game. Notwithstanding, plaintiff was not placed into play during the game.  Plaintiff was not placed into play the following game on February 11, 2017, against University of Nevada, Las Vegas.

75.     On February 15, 2017, in the game against Fresno State, plaintiff was put in the game in the second half when the team was down approximately 20 points and then taken right back out after a mere 2 minutes of play in which he did not score and had 1 rebound.  Upon returning the bench, plaintiff's team mate opined "that was crazy how he just did you" (referring to being put into play for such a short period) and plaintiff replied, "I know."  Such conduct has the deleterious affect on a player's playing statistics, since no matter how little time is spent on the court, being put into play causes the game to count from a statistical standpoint, the measurement of a player's

1   contribution to the team.  As observed by sociologists who study the phenomena, an obvious feature

2   of sport in the United States is its competitiveness among both athletes and among sports

3   organizations for the services of athletes possessing demonstrated skills.  The results of these skills

4   are capable of being precisely measured through the use of sports statistics with innumerable methods

5   of measurement.

6        76.        Defendant Assistant Coach TYLER OJANEN, Caucasian, often sits with the players

7   and not with the other coaches during games.  Plaintiff often sat in the middle or at end of the bench.

8   When plaintiff replied, "I know" to his team mate on February 15, 2017, after being taken out after a

9   mere two minutes of play against Fresno State, Assistant Coach TYLER OJANEN yelled at plaintiff

10  "what do you mean 'you know'"?  Defendant Assistant Coach TYLER OJANEN then told plaintiff

11  "we've been winning without you" and that the team did not need him.  Plaintiff replied to defendant

12  TYLER OJANEN "you're a little late, I've already been told that by the Head Coach."  Plaintiff then

13  clarified to defendant Assistant Coach TYLER OJANEN that the conversation was between him and

14  his team mate which made Assistant Coach TYLER OJANEN stand up and start yelling in plaintiff's

15  face in close proximity.  Plaintiff asked the defendant Assistant Coach TYLER OJANEN if he could

16  move but he did not and continued to try to antagonize plaintiff and to upset him with an obvious

17  desire to have plaintiff join him in making a scene court-side.  Defendant Assistant Coach TYLER

18  OJANEN told plaintiff he wasn't "sad enough" while sitting on the bench while the team was losing.

19  Plaintiff asked defendant Assistant Coach TYLER OJANEN what did he want plaintiff to do?

20  Plaintiff had been clapping and cheering for his team the whole game. Defendant Assistant Coach

21  TYLER OJANEN got more upset with plaintiff's refusal to being goaded into a hostile reaction in

22  light of the obvious tactic defendant DAVID WOJCIK had engaged in to diminish plaintiff's

23  statistical performance by putting him into the games for minimal times so as to frustrate him.

24       77.        The following practice as plaintiff was walking, he was stopped by defendant

25  Assistant Coach TYLER OJANEN who said: "What's going on, you don't seem like you like being

26  on the team and your just buying time until you graduate."   Defendant Assistant Coach TYLER

27  OJANEN also said to plaintiff: "you look like your abandoning ship."  Plaintiff replied that defendant

28  Assistant Coach TYLER OJANEN and defendant DAVID WOJCIK had mistreated him for a long

1   time and that he was tired of the games they were playing with him – not allowing him to practice
2   and not playing him in games, walking by him without speaking to him, telling jokes when he prayed,
3   doing everything they could to make him quit along with all the other degrading things they engaged
4   in, but that it was not going work anymore and that he refused to get upset. Plaintiff told defendant
5   Assistant Coach TYLER OJANEN that, as far as abandoning the ship, he would never stop cheering
6   for his teammates, but as for the coaches? He would not be cheering for the coaches for the things
7   that they had done to him and his teammates. Plaintiff told defendant Assistant Coach TYLER
8   OJANEN that his teammates deserved to win and that he would go with the flow and be happy when
9   the season was  over.

10      78.    On February 18, 2017, against United States Air Force Academy, plaintiff was
11  allowed to play a mere 5 minutes and he did not score and had 1 rebound. Plaintiff was not placed
12  into play the following game on February 22, 2017, against Utah State. On February 25, 2017,
13  against Boise State, plaintiff was put into the game in the last 7 minutes of a blowout and he scored
14  14 points and had 2 rebounds to narrow the loss.

15      79.    March 1, 2017, was "Senior Night" against Nevada.  As a consequence, plaintiff was
16  allowed to start since he was a senior. Senior Night was a night plaintiff looked forward to his entire
17  time on the team and his family and friends came from long distances to see his last home game.
18  Plaintiff had been recruited by Nevada and he had chose to come to SJSU instead, so it made Senior
19  Night that much more poignant. After two early fouls, defendant DAVID WOJCIK pulled plaintiff
20  out of the game and was placed on the bench for the rest of the half.  Defendant DAVID WOJCIK's
21  usual practice was to start the same five players in the second half who started the first half.  On
22  Senior Night, however, plaintiff was not allowed to start the second half.

23      80.    The game quickly got out hand in the second half and San Josè State Spartans men's
24  basketball team was losing badly.  At one point defendant DAVID WOJCIK subbed plaintiff in the
25  game while the opposing team was shooting the first of two free throws. After plaintiff lined up on
26  the free throw line, the opposing team's player missed the free throw.  Without delay, defendant
27  DAVID WOJCIK immediately subbed plaintiff out of the game once again.  Defendant DAVID
28  WOJCIK put in unproductive freshman to play most of the rest of the game. Despite this, plaintiff

scored 3 points and had 2 rebounds in 14 minutes of play.

81.    After this game, plaintiff's father waited for defendant DAVID WOJCIK to finish his press obligations to ask him "What do you have against my son?"  Defendant DAVID WOJCIK replied: "I don't know what you mean."  Plaintiff's father, staring directly at defendant DAVID WOJCIK, said: "You know exactly what I mean."  No response was provided. Plaintiff was not placed into play the following game on March 4, 2017, against Wyoming. On March 8, 2017, against Utah State in the playoffs plaintiff was allowed to play 9 minutes and he scored 8 points.

82.    The San Josè State Spartans men's basketball team finished the 2016-2017 season 14–16, 7–11 in Mountain West play to finish in a tie for eighth place. They lost in the first round of the Mountain West Tournament to Utah State.  The accepted standard for coaching success is the ratio of victories achieved as opposed to losses.

83.    Plaintiff was provided 286 minutes of game playing time during the 2016-2017 season which placed him the 10th highest playing member of the team out of 13, representing a 37% reduction in playing time from the 2015-2016 season.  From the game after December 10, 2016, the date San Josè State Spartans men's basketball team played Life Pacific College and defendant DAVID WOJCIK acknowledged plaintiff was a "little bit better off the bench for us," plaintiff's average playing time until he vocally opposed defendant DAVID WOJCIK's conduct after the game on January 18, 2017, was 17.66 minutes.  After January 18, 2017, plaintiff's average playing time was 4.2 minutes a game. Of those games defendant DAVID WOJCIK allowed plaintiff to play (not benched) after January 18, 2017, plaintiff's average playing time was 7 minutes a game representing a 60% reduction in average playing time from the average between December 20, 2016, and his protected conduct on January 18, 2017.  Plaintiff's efficiency rating for the 2016-2017 season remained the same at an EFF score of 5.4286 giving him the 6th best EFF score among 13 team mates for the 2016-17 season despite the retaliation defendant DAVID WOJCIK directed toward him.

84.    Defendant DAVID WOJCIK is the brother of Doug Wojcik, both of whom grew up in Wheeling, West Virginia.  Doug Wojcik also served as a head college basketball coach at both the University of Tulsa and the College of Charleston. In 2005, defendant DAVID WOJCIK joined the staff of his older brother Doug Wojcik as assistant coach at Tulsa and remained there for four seasons

(2006-09).  While at the College of Charleston, Doug Wojcik was found to have "likely" been both "verbally" and "emotionally" abusive toward players in July 2014, as a result of a College of Charleston internal investigation. Doug Wojcik was suspended by College of Charleston's President P. George Benson for the month of August 2014, but ultimately terminated for just cause on August 6, 2014, by new president Glenn McConnell.  Plaintiff is informed and believes and thereupon alleges that defendant DAVID WOJCIK, being from a Southern state where such conduct is tolerated and possibly inculcated given his brother's similarly documented conduct, harbored antipathy toward Blacks in particular and civility and fairness in general.

85.    In 2015, NCAA's five conferences voted to expand what Division I schools could provide under an athletic scholarship. The vote, taken during the NCAA's annual convention, redefined an athletic scholarship so that it could cover not only the traditional tuition, room, board, books and fees, but also the incidental costs of attending college. That meant a scholarship was able to pay for items including transportation and miscellaneous personal expenses.

86.    Defendant DAVID WOJCIK and his responsible coaching staff failed to pay over to plaintiff and other team members travel/meal stipends for personal expenses while traveling. When San Josè State University has a break, the on campus cafeteria and restaurants are closed.  San Josè State University Mens Basketball Team members are provided money from their NCAA scholarships to buy food outside of San Josè State University campus.  San Josè State University  Mens Basketball Team's Head Coach defendant DAVID WOJCIK provided San Josè State University Mens Basketball Team members $250, but had them sign for receiving $500, informing them he didn't want them to spend all the money at one time and that he would save the money to give to them later. Later when asked for the money, defendant DAVID WOJCIK said he spent the other $250 each on a trip to Benihana while they were on the road. Defendant DAVID WOJCIK never informed the players that this was going to take place before hand. Plaintiff is informed and believes that defendant DAVID WOJCIK was already budgeted separate funds for team meals that was independent of the players' scholarship money.  Moreover, plaintiff is informed and believes that the meals provided at Benihana did not cost $250 per person.

87.     At the end of the season, some coaching staff sought signatures from San Josè State University Mens Basketball Team members acknowledging receipt of the stipends when, in a number of cases, it was not true.  Plaintiff has now graduated and the funds representing his stipend for personal expenses representing that portion of his NCAA scholarship remain unpaid.

88.     In February 2017, San Josè State University announced that Athletics Director Gene Bleymaier had taken on a new role as special advisor to the president, with responsibility for ensuring momentum and progress on development plans for athletics facilities.  Deputy Athletics Director Marie Tuite was named interim director.

89.     Plaintiff is informed and believes and thereupon alleges that defendant DAVID WOJCIK admitted to using "butt buddies" towards players but denied all racial and religious animus.

90.     On or about July 9, 2017, Director of Operations Ryan Cooper called plaintiff to inform him that San Josè State University was going to make a decision on the status of defendant DAVID WOJCIK as the San Josè State Spartans men's basketball team head coach "in the next week or so." Director of Operations Cooper asked plaintiff what he was going to do if defendant DAVID WOJCIK was not fired and whether plaintiff would "let it go" or "take it public." Director of Operations Cooper advised plaintiff not to take it public if he "still want action at the NBA." Director of Operations Cooper told plaintiff that if he decided to take it public, he opined that defendant DAVID WOJCIK would be fired and to let him know ahead of time so he could search for another job "before the ship sails."

91.     Defendant DAVID WOJCIK submitted his resignation on July 10, 2017.  Defendant DAVID WOJCIK was afforded the opportunity to make the following press release about his resignation: "This past year has been emotionally challenging for me with the loss of my father. His passing made me evaluate what is important in life and the value of family. With the considerable needs of my widowed mother as well as my son moving to the East Coast after his high school graduation, I believe it is the appropriate time to resign my position as head men's basketball coach at San Josè University." Defendant DAVID WOJCIK added: "The opportunity to lead the men's basketball team has been a privilege. I am proud to leave the program positioned for continued success and wish the program and San José State University all the best."  Acting athletic director

Marie Tuite made the following public comment to the media: "Earlier today, Dave Wojcik resigned his position as head men's basketball coach. On behalf of our entire department, I want to wish Dave and his family the very best as they begin a new chapter."

92.     Plaintiff is informed and believes and thereupon alleges that defendant SAN JOSÈ STATE allowed defendant DAVID WOJCIK to resign without controversy and afforded him to make public statements to the press that the decision to resign was wholly unrelated to his offensive, discriminatory and retaliatory conduct. The not-so-subtle suggestion that plaintiff should "let it go" by Director of Operations Ryan Cooper to avoid consequences to his basketball career were further acts designed to chill plaintiff's efforts to bring his concerns over defendant DAVID WOJCIK's offensive and discriminatory conduct and defendants DAVID WOJCIK and TYLER OJANEN's retaliatory conduct as alleged herein. Allowing defendant DAVID WOJCIK to resign in light of his offensive, discriminatory and retaliatory conduct with no professional consequence for his actions and without care or concern for the damage defendants DAVID WOJCIK and TYLER OJANEN's did to plaintiff and his own career prospects were acts that ratified and condoned defendants DAVID WOJCIK and TYLER OJANEN's conduct.

93.     As a direct and proximate result of defendants' unlawful conduct as alleged herein, plaintiff has suffered and will continue to suffer emotional injuries, including, but not limited to, depression, stress, humiliation and anxiety, Plaintiff has suffered and continues to suffer consequential financial damages. Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial.

94.     The conduct of defendants DAVID WOJCIK and TYLER OJANEN, and/or their agents/employees, as described herein, was malicious, fraudulent and/or oppressive or done with a wilful and conscious disregard for plaintiff's rights and for the deleterious consequences of defendants' actions. Consequently, plaintiff is entitled to punitive damages from each of these defendants.

///

///

///

**FIRST CAUSE OF ACTION**

**(Violation of Section 601 of Title VI of the Civil Rights Act of 1964
Against Defendant SAN JOSÈ STATE)**

**[Count One – Discrimination]**

95.     Plaintiff incorporates by reference and re-alleges herein each allegation contained in all preceding paragraphs. This cause of action is alleged against defendant SAN JOSÈ STATE only.

96.     Congress has abrogated States' sovereign immunity for "violations [of Title VI] that occur in whole or in part after October 12, 1986." 42 U.S.C. § 2000d7(b) (Supp.1987).  Congress has conditioned receipt of federal funds for certain "program[s] and activit[ies]" upon a state's waiver of sovereign immunity. See 42 U.S.C. § 2000d–4a.

97.     Section 601 of Title VI of the Civil Rights Act of 1964 (Title VI) provides that "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." SAN JOSÈ STATE participates in Title IV federal financial aid programs.

98.     The actions of the defendant SAN JOSÈ STATE, by and through defendant DAVID WOJCIK, as alleged herein had a discriminatory impact against plaintiff and defendant SAN JOSÈ STATE, by and through defendant DAVID WOJCIK, acted with an intent or purpose to discriminate based upon plaintiff's membership in a protected class.  The decisions and actions by defendant DAVID WOJCIK on behalf of defendant SAN JOSÈ STATE to afford plaintiff lesser playing time in games and disallowing him to participate in practice despite his demonstrated performance, the ridicule of his religious beliefs, the scrutiny of plaintiff's activities outside of basketball, the withholding of NCAA scholarship proceeds and other acts of harassment alleged herein was motivated by race and plaintiff's race was a determining factor in this conduct. Plaintiff was damaged by the conduct as alleged herein.

99.     Plaintiff is entitled to recover his attorneys' fees from defendant SAN JOSÈ STATE pursuant to 20 U.S.C. §§ 1681 - 1688, and 42 U.S.C. § 1988 should he prevail in this action.

///

///

**[Count Two – Retaliation]**

100.    Plaintiff incorporates by reference and re-alleges herein each allegation contained in all preceding paragraphs.

101.    This claim is brought for retaliation under Title VI and its interpretive regulation, 34 C.F.R. § 100.7(e) of Title VI which states:

> No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by section 601 of the Act or this part, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this part.

102.    Plaintiff's complaints, as well as his father's on his behalf, and other actions taken to end defendant DAVID WOJCIK's discriminatory conduct based on race and gender were actions protected by the anti-retaliation provisions of Title VI.  Plaintiff reasonably believed that defendant DAVID WOJCIK's conduct was based on his race, his public affirmation of God (religion) and that his homophobic and gender-based offensive statements were designed to emasculate young male athletes in a severe and/or pervasive way.  Plaintiff was thereafter subjected to adverse actions in the form of lesser playing time in games and not allowed to participate in practice, ridicule of his religious beliefs, withholding of NCAA scholarship proceeds, efforts to persuade him to quit the San Josè State Spartans men's basketball team and other acts of harassment alleged herein.  A causal link exists between plaintiff's protected activity and the adverse actions. This conduct by defendants DAVID WOJCIK and TYLER OJANEN led plaintiff to find, as a reasonable person would, that it was designed to dissuade a reasonable person from making or supporting a charge of discrimination. Plaintiff was damaged by the conduct as alleged herein.

103.    Plaintiff is entitled to recover his attorneys' fees from defendant SAN JOSÈ STATE pursuant to 20 U.S.C. §§ 1681 - 1688, and 42 U.S.C. § 1988 should he prevail in this action.

WHEREFORE, plaintiff  prays for relief as hereinafter provided.

///

///

///

///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**SECOND CAUSE OF ACTION**

**(Violation of Title IX of the United States Education Amendments of 1972
– 20 U.S.C. §§ 1681–1688 Against Defendant SAN JOSÈ STATE)**

**[Count One – Discrimination]**

104.     Plaintiff incorporates by reference and re-alleges herein each allegation contained in all preceding paragraphs. This count is alleged against defendant SAN JOSÈ STATE only.

105.     Title IX of the United States Education Amendments of 1972 (Title IX) provides in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."  (20 U.S.C. § 1681(a).) The Civil Rights Restoration Act of 1987 made Congress' intent plain that "program or activity," as used in Title IX, applies to any program or activity so long as any part of the educational institution receives federal financial assistance. 20 U.S.C. § 1687. Thus, SAN JOSÈ STATE is subject to Title IX even if none of the funding for its athletic programs comes from federal sources.

106.     The Supreme Court has previously held that Congress has properly abrogated state sovereign immunity for Title IX claims. (See *Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60, 72, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992).)

107.     In 1975, the United States Department of Health, Education and Welfare (the predecessor of the United States Department of Education ("DOE")) adopted regulations interpreting Title IX.  These regulations are codified at 34 C.F.R. Part 106 (The DOE regulations adopting the HEW regulations are at 45 C.F.R. Part 86 – the "Regulations").

108.     With regard to athletic programs, Section 106.41(a) of 34 C.F.R. provides that intercollegiate athletics are included within the "program or activity" requirements of Title IX.

109.     Same sex harassment is a form of harassment actionable under Title IX.  As an MPP Employee, defendant DAVID WOJCIK was designated as a "management" or "supervisory" employee under the provisions of the Higher Education Employer-Employee Relations Act, as set for in defendant SAN JOSÈ STATE's Executive Order 1097. (Cal. Code Regs. Title 5 § 42720 et seq.) Defendant SAN JOSÈ STATE's Executive Order 1097 defines "harassment" as "unwelcome conduct, based on the Complainant's Protected Status, that is sufficiently severe, persistent or

1  pervasive that its effect, whether or not intended, could be considered by a reasonable person in the
2  shoes of the Complainant, and is in fact considered by the Complainant, as limiting her/his ability to
3  participate in or benefit from the services, activities or opportunities offered by the University."

4       110.   Defendant DAVID WOJCIK, as an agent and MPP Employee of defendant SAN
5  JOSÈ STATE, used the terms "pussy" and "fuck buddies" towards the players, including plaintiff,
6  and defendant DAVID WOJCIK admitted to using the terms "butt buddies" towards players.  Such
7  conduct was done repeatedly during both 2015-2016 and 2016-2017 basketball seasons in front of his
8  coaching staff who were also often the recipients of such slurs.  Plaintiff found such objectively
9  hostile statements, subjectively hostile and was gender related by demeaning young males of their
10 role and identity as males and he objected to them.

11      111.   Under defendant CSU's Executive Order 1097, any Employee who knows or has
12 reason to know of allegations or acts that violate the policy outlined in Executive Order 1097 had a
13 duty to promptly inform the Discrimination/Harassment/Retaliation (DHR) Administrator or Title IX
14 Coordinator. These Employees were required to disclose all information including the names of the
15 Parties, even where the person has requested anonymity.  "Employee" is defined by defendant CSU's
16 Executive Order 1097 as a "person legally holding a position in the CSU" which included full-time,
17 part-time, permanent, tenured, probationary, temporary, intermittent, casual, and per-diem positions.
18 The Assistant Coaches that reported to defendant DAVID WOJCIK were employees for purposes of
19 CSU's Executive Order 1097.  San Josè State Spartans men's basketball team's Assistant Coaches
20 were deliberately indifferent to the same-sex sexual harassment of plaintiff and others by defendant
21 DAVID WOJCIK who violated his duty—assumed by defendant SAN JOSÈ STATE in exchange for
22 federal funds—not to discriminate on the basis of sex in violation of Title IX.  Plaintiff was damaged
23 by the conduct as alleged herein and the indifference.

24      112.   Plaintiff is entitled to recover his attorneys' fees from defendant SAN JOSÈ STATE
25 pursuant to 20 U.S.C. §§ 1681 - 1688, and 42 U.S.C. § 1988 should he prevail in this action.

26                          **[Count Two – Retaliation]**

27      113.   Plaintiff incorporates by reference and re-alleges herein each allegation contained in
28 all preceding paragraphs. This count is alleged against defendant SAN JOSÈ STATE only.

114.     This claim is brought for retaliation under Title IX and its interpretive regulation, 34

C.F.R. § 106.71, which incorporates 34 C.F.R. § 100.7(e) of Title VI which states:

> No recipient or other person shall intimidate, threaten, coerce, or discriminate against
> any individual for the purpose of interfering with any right or privilege secured by
> section 601 of the Act or this part, or because he has made a complaint, testified,
> assisted, or participated in any manner in an investigation, proceeding or hearing
> under this part.

115.     Plaintiff's complaints, as well as his father's on his behalf, and other actions taken to

end defendant DAVID WOJCIK's discriminatory conduct based on race and gender were actions

protected by the anti-retaliation provisions of Title IX.  Plaintiff found such objectively hostile

statements, subjectively hostile and when he objected to them, he reasonably believed that defendant

DAVID WOJCIK's homophobic and gender-based offensive statements were designed to emasculate

young male athletes in a severe and/or pervasive way.  Plaintiff was thereafter subjected to adverse

actions in the form of lesser playing time in games and not allowed to participate in practice, ridicule

of his religious beliefs, withholding of NCAA scholarship proceeds, efforts to persuade him to quit

the San Josè State Spartans men's basketball team and other acts of harassment alleged herein.  A

causal link exists between plaintiff's protected activity and the adverse actions. This conduct by

defendants DAVID WOJCIK and TYLER OJANEN led plaintiff to find, as a reasonable person

would, that it was designed to dissuade a reasonable person from making or supporting a charge of

discrimination. Plaintiff was damaged by the conduct as alleged herein.

116.     Plaintiff is entitled to recover his attorneys' fees from defendant SAN JOSÈ STATE

pursuant to 20 U.S.C. §§ 1681 - 1688, and 42 U.S.C. § 1988 should he prevail in this action.

WHEREFORE, plaintiff  prays for relief as hereinafter provided.

### THIRD CAUSE OF ACTION

**(Violation of the Fourteenth Amendment to the United States Constitution
– 42 U.S.C. § 1983 Against Defendant DAVID WOJCIK)**

117.     Plaintiff incorporates by reference and re-alleges herein each allegation contained in

all preceding paragraphs. This cause of action is alleged against defendant DAVID WOJCIK in his

individual capacity only.

118.     The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution

dictates that a state actor shall not "deny to any person within its jurisdiction the full protection of the

laws." U.S. Const. amend. XIV.

119.    The Equal Protection Clause is enforced through 42 U.S.C. § 1983 ("Section 1983"), which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

120.    Under Section 1983, an individual such as defendant DAVID WOJCIK, acting under color of state authority – here, as a Management Personnel Plan (MPP) employee of the California State University system – may be held liable for their violation of the rights of African American student-athletes under the Fourteenth Amendment, namely by treating them differently than Caucasian athletes.

121.    Defendant DAVID WOJCIK violated the Equal Protection rights of plaintiff as alleged herein.  The intentional conduct by defendant DAVID WOJCIK alleged herein was motivated by plaintiff's race and violated his Equal Protection rights. Plaintiff was damaged by the conduct as alleged herein.

122.    Plaintiff is entitled to recover his attorneys' fees from defendant SAN JOSÈ STATE pursuant to 20 U.S.C. §§ 1681 - 1688, and 42 U.S.C. § 1988 should he prevail in this action.

WHEREFORE, plaintiff  prays for relief as hereinafter provided.

## FOURTH CAUSE OF ACTION

### (Violation of the First Amendment to the United States Constitution – 42 U.S.C. § 1983 Against Defendants DAVID WOJCIK and TYLER OJANEN)

123.    Plaintiff incorporates by reference and re-alleges herein each allegation contained in all preceding paragraphs.  This cause of action is alleged against defendants DAVID WOJCIK and TYLER OJANEN in their individual capacities only.

124.    The First Amendment to the U.S. Constitution ensures that there is no prohibition on the free exercise of religion or abridging the freedom of speech, U.S. Const. amend. I.

125.    Plaintiff and his father complained to defendant DAVID WOJCIK about his unlawful conduct as a alleged herein.  Plaintiff's complaints, as well as his father's on his behalf, and other

1  actions taken to end defendant DAVID WOJCIK's discriminatory conduct based on race and gender

2  were actions protected by the First Amendment to the United States Constitution.  Defendants

3  DAVID WOJCIK and TYLER OJANEN intended to interfere with the plaintiff's First Amendment

4  rights by engaging in conduct alleged herein – as to defendant DAVID WOJCIK, in the form of

5  affording plaintiff lesser playing time in games and not allowed to participate in practice, ridiculing

6  his religious beliefs, withholding of NCAA scholarship proceeds and other acts of harassment alleged

7  herein – and as to defendant TYLER OJANEN, in the form of yelling at plaintiff when he and

8  another teammate commented on defendant DAVID WOJCIK's retaliation and his efforts to persuade

9  plaintiff he was unwanted on the San Josè State Spartans men's basketball team as alleged herein.  A

10  causal link exists between plaintiff's protected activity and the actions designed to chill plaintiff's

11  speech.

12  126.    Under Section 1983, individuals such as defendants DAVID WOJCIK and TYLER

13  OJANEN, acting under color of state authority, may be held liable for their violations of the rights of

14  student-athletes under the First Amendment, namely by engaging in the above-alleged conduct

15  designed to chill plaintiff's speech and his exercise of religion. There was a very short proximity in

16  time between plaintiff's protected speech and the aforementioned conduct designed to chill plaintiff's

17  speech, defendants DAVID WOJCIK and TYLER OJANEN expressed opposition to the speech and

18  other evidence that the reasons for their conduct alleged herein were not retaliatory are false and pre-

19  textual.

20  127.    Defendants DAVID WOJCIK and TYLER OJANEN violated the First Amendment

21  rights of plaintiff as alleged herein.  The intentional conduct by defendants DAVID WOJCIK and

22  TYLER OJANEN alleged herein was motivated by plaintiff's speech and his exercise of religion.

23  Plaintiff was damaged by the conduct as alleged herein as alleged herein.

24  128.    Plaintiff is entitled to recover his attorneys' fees from defendants DAVID WOJCIK

25  and TYLER OJANEN pursuant to 20 U.S.C. §§ 1681 - 1688, and 42 U.S.C. § 1988 should he prevail

26  in this action.

27  WHEREFORE, plaintiff  prays for relief as hereinafter provided.

28

1
2

## FIFTH CAUSE OF ACTION

**(Violation of Equal Rights under the Law
– 42 U.S.C. § 1981 Against Defendants DAVID WOJCIK and TYLER OJANEN)**

3
4
5

129.    Plaintiff incorporates by reference and re-alleges herein each allegation contained in all preceding paragraphs. This cause of action is alleged against defendants DAVID WOJCIK and TYLER OJANEN in their individual capacities only.

6
7
8
9
10
11
12

130.    42 U.S.C. § 1981 provides that all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.  The statute defines, make and enforce contracts to include the making, performance, modification and termination of contract, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship.

13
14
15
16
17

131.    By applying for, and receiving admission to, San Josè State University, and being recruited to play for San Josè State Spartans men's basketball team and obtaining a NCAA scholarship therefore, plaintiff had existing contractual relationships.  Defendants DAVID WOJCIK and TYLER OJANEN impaired the benefits, privileges, terms, and conditions of the contractual relationship plaintiff had in those existing contractual relationships as alleged herein.

18
19
20
21
22

132.    In violation of 42 U.S.C. § 1981, defendant DAVID WOJCIK discriminated against plaintiff on the basis of his race.  In violation of 42 U.S.C. § 1981, defendants DAVID WOJCIK and TYLER OJANEN, and each of them and/or their agents/employees retaliated against plaintiff for complaining of conduct which he reasonably believed constituted unlawful racial, religious and gender-based  discrimination and/or harassment.

23

133.    Plaintiff was damaged by the conduct as alleged herein.

24
25
26

134.    Plaintiff is entitled to recover his attorneys' fees from defendants DAVID WOJCIK and TYLER OJANEN pursuant to 20 U.S.C. §§ 1681 - 1688, and 42 U.S.C. § 1988 should he prevail in this action.

27

WHEREFORE, plaintiff  prays for relief as hereinafter provided.

28

---

**SIXTH CAUSE OF ACTION**

**(Conspiracy to Violate Equal Protection of the Laws and/or
Equal Privileges and Immunities under the Laws
– 42 U.S.C. § 1985(3) Against Defendants DAVID WOJCIK and TYLER OJANEN)**

135.    Plaintiff incorporates by reference and re-alleges herein each allegation contained in all preceding paragraphs. This cause of action is alleged against defendants DAVID WOJCIK and TYLER OJANEN in their individual capacities only.

136.    42 U.S.C. § 1985(3) prohibits two or more persons from conspiring for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws.  Plaintiff is informed and believes and thereupon alleges that defendants DAVID WOJCIK and TYLER OJANEN conspired for the purpose of depriving, either directly or indirectly, plaintiff of the equal protection of the laws, or of equal privileges and immunities under the laws.  When defendant TYLER OJANEN confronted plaintiff on February 15, 2017, after responding to the comments of a team mate when taken out of the game by defendant DAVID WOJCIK after a mere two minutes of play against Fresno State and the subsequent conduct by defendants DAVID WOJCIK and TYLER OJANEN thereafter as alleged herein were acts in furtherance of this conspiracy whereby plaintiff was injured in his person and/or property and/or deprived plaintiff his rights or privileges for complaining of conduct which he reasonably believed constituted unlawful racial, religious and gender-based  discrimination and/or harassment.

137.    Plaintiff was damaged by the conduct as alleged herein.

138.    Plaintiff is entitled to recover his attorneys' fees from defendants DAVID WOJCIK and TYLER OJANEN pursuant to 20 U.S.C. §§ 1681 - 1688, and 42 U.S.C. § 1988 should he prevail in this action.

WHEREFORE, plaintiff  prays for relief as hereinafter provided.

**PENDENT STATE CLAIMS**

139.    Plaintiff caused to be transmitted to the California State University's Office of the Chancellor Risk Management and Public Safety on July 19, 2017 and which was rejected by operation of law on or about September 4, 2017. The Trustees of defendant SAN JOSÈ STATE are an arm of the state that can properly lay claim to sovereign immunity. (See *Jackson v. Hayakawa,*

682 F.2d 1344, 1350–51 (9th Cir. 1982).) In an action for incurred monetary damages, state sovereign immunity can be overcome only by explicit abrogation by Congress pursuant to its powers under the Fourteenth Amendment or by state consent to suit. (See *In re Harleston,* 331 F.3d 699, 701 (9th Cir. 2003).)   While a federal district court may exercise supplemental jurisdiction over state claims which is governed by 28 U.S.C. § 1367, that statute is silent as to sovereign immunity and the Ninth Circuit has held that 28 U.S.C. § 1367 does not abrogate state sovereign immunity for supplemental state law claims. (See *Stanley v. Trustees of California State University,* 433 F.3d 1129, 1134 (9th Cir. 2006).)

140.    Accordingly, plaintiff requests defendant SAN JOSÈ STATE to consent to have the pendent state claims asserted against it herein to be adjudicated in this federal district court along with the federal claims against it under Title VI and Title IX, herein, the latter which Congress abrogated state sovereign immunity pursuant to its powers under the Fourteenth Amendment. Alternatively, if defendant SAN JOSÈ STATE refuses to consent to have the pendent state claims asserted against it adjudicated with this action, plaintiff requests the federal district court to remand, rather than dismiss. (See *Carnegie–Mellon University v. Cohill,* 484 U.S. 343, 353, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) [holding that judicial policy favors remand of claims that may be properly heard before a state court].)

**SEVENTH CAUSE OF ACTION**

**(Intentional Infliction of Emotional Distress Against
Defendants DAVID WOJCIK and TYLER OJANEN)**

141.    Plaintiff incorporates by reference and re-alleges herein each allegation contained in all preceding paragraphs. This cause of action is alleged against defendants DAVID WOJCIK and TYLER OJANEN only.

142.    Defendants DAVID WOJCIK and TYLER OJANEN intentionally determined to try to create such a hostile environment for plaintiff so that he would quit the San Josè State Spartans men's basketball team.  Defendant DAVID WOJCIK afforded plaintiff lesser playing time in games and did not allow plaintiff to participate in practice, ridiculed his religious beliefs, referred to him and his team mates and assistant coaches as "pussy," "fuck buddies" and "butt buddies," withheld NCAA scholarship proceeds and engaged in other acts of harassment alleged herein that were outrageous and which were highly offensive to a reasonable person.  Defendant TYLER OJANEN yelled at plaintiff

when he and another teammate commented on defendant DAVID WOJCIK's retaliation and engaged in efforts to persuade plaintiff that he was unwanted on the San Josè State Spartans men's basketball team as alleged herein which constituted outrageous conduct and which were highly offensive to a reasonable person.  Plaintiff was harmed and defendants DAVID WOJCIK and TYLER OJANEN's conduct which was a substantial factor in causing plaintiff's harm.

WHEREFORE, plaintiff  prays for relief as hereinafter provided.

### EIGHTH CAUSE OF ACTION

**(Negligent Infliction of Emotional Distress Against All Defendants)**

143.    Plaintiff incorporates by reference and re-alleges herein each allegation contained in all preceding paragraphs. This cause of action is alleged against all defendants.

144.     In 2015, Timothy P. White, Chancellor for the California State University System, issued Executive Order 1097 in response to the Campus Sexual Violence Elimination Act (the SaVE Act) and related guidance from the U.S. Department of Education, Office for Civil Rights, addressing Title IX of the Education Amendments of 1972.  Executive Order 1097 superseded Executive Order 1074 which itself was issued in response to the April 2011 "Dear Colleague" letter from the U.S. Department of Education Office of Civil Rights addressing Title IX of the Education Amendments of 1972 and, like Executive Order 1097, this policy and complaint procedure applied systemwide.  In accordance with policy of the California State University, the campus president has the responsibility for implementing executive orders where applicable.  As a consequence, Executive Order 1097 created a special relationship between SAN JOSÈ STATE with their student-athletes and/or imposed a duty owed the plaintiff which was assumed by the defendant or imposed on the defendant as a matter of law.

145.    California Government Code Section 815.2, subdivision (a), codifies the doctrine of respondeat superior as it applies to public entities like defendant SAN JOSÈ STATE, stating: "A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee. . . ."

146.    Executive Order 1097 proscribes against discrimination and harassment based on gender, race and religion among other protected bases.  Executive Order 1097 also proscribes against retaliation for opposing said acts of discrimination and harassment.  Plaintiff was harmed and defendants conduct

WHEREFORE, plaintiff  prays for relief as hereinafter provided.

## NINTH CAUSE OF ACTION

### (Conversion – Against All Defendants)

147.    Plaintiff incorporates by reference and re-alleges herein each allegation contained in all preceding paragraphs.

148.    Plaintiff had an ownership or right to possession of that portion of unspent  property in the form of an NCAA athletic scholarship that covered not only the traditional tuition, room, board, books and fees, but also the incidental costs of attending college.  Defendants SAN JOSÈ STATE, DAVID WOJCIK and TYLER OJANEN and San Josè State Spartans men's basketball team's other Assistant Coaches converted by a wrongful act or disposition of plaintiff's property rights and plaintiff was damaged thereby.

WHEREFORE, plaintiff  prays for relief as hereinafter provided.

## TENTH CAUSE OF ACTION

### (Violation of Unruh Civil Rights Act – Civil Code §§ 51, 51.5 – Against All Defendants)

149.    Plaintiff incorporates by reference and re-alleges herein each allegation contained in all preceding paragraphs.

150.    Defendant SAN JOSÈ STATE is a "business establishment" within the meaning of the Unruh Act, California Civil Code § 51 and California Civil Code § 51.5.

151.    defendants DAVID WOJCIK and TYLER OJANEN's acts, omissions and conduct constituted intentional discrimination against the plaintiff based on his sex, race, color and/or religion.

152.    In engaging in and performing the acts, omissions and conduct alleged above, defendant SAN JOSÈ STATE, DAVID WOJCIK and TYLER OJANEN and DOES 1 through 50, inclusive, violated, or aided or incited the violation of, or made discrimination or distinction contrary

to, the Unruh Act, California Civil Code § 51, and/or California Civil Code § 51.5.

153.    In engaging in and performing the acts, omissions and conduct alleged above, defendants SAN JOSÈ STATE, DAVID WOJCIK and TYLER OJANEN and DOES 1 through 50, inclusive, aided or incited a denial of, or  made a discrimination or distinction contrary to, the Unruh Act, California Civil Code § 51 and California Civil Code § 51.5, and are therefore liable for said acts, omissions and conduct pursuant to California Civil Code § 52(a).

154.    As an actual, direct, proximate and legal result of the wrongful conduct of defendants, and each of them, alleged herein, plaintiff was damaged as alleged herein.

155.    Pursuant to California Civil Code §§ 51, 51.5, 52(a), plaintiff is entitled to recover from defendants, and each of them, his actual damages, and any amount that may be determined by a jury up to a maximum of three times the amount of actual damage but in no case less than four thousand dollars ($4,000), and any attorney's fees that may be determined by the Court in addition thereto.

156.    Defendants DAVID WOJCIK and TYLER OJANEN and DOES 1 through 50, inclusive, are legally responsible for, and have a duty to pay, all of the damages, punitive or exemplary damages, penalties, attorneys' fees, and costs set forth in this cause of action pursuant to California Government Code § 820(a).

157.    Defendant SAN JOSÈ STATE is legally responsible for, and has a duty to pay, all of the damages, penalties, attorneys' fees, and costs set forth in this cause of action, except for punitive or exemplary damages, pursuant to California Government Code § 815.2(a).

WHEREFORE, plaintiff  prays for relief as hereinafter provided.

## ELEVENTH CAUSE OF ACTION

### (Violation of Mandatory Duties – Govt. Code §§ 815.6, 820 – Against All Defendants)

158.    Plaintiff incorporates by reference and re-alleges herein each allegation contained in all preceding paragraphs.

159.    A "Public entity" is defined to include "the state, the Regents of the University of California, the Trustees of the California State University and the California State University, a county, city, district, public authority, public agency, and any other political subdivision or public

1  corporation in the State." (Cal. Gov't Code § 811.2.)  Defendant SAN JOSÈ STATE is a public

2  entity.

3      160.    Government Code section 815.6 states that where a public entity is under a mandatory

4  duty imposed by an enactment that is designed to protect against the risk of a particular kind of

5  injury, the public entity is liable for an injury of that kind proximately caused by its failure to

6  discharge the duty unless the public entity establishes that it exercised reasonable diligence to

7  discharge the duty.  Government Code section 810.6 defines "enactment" as "a constitutional

8  provision, statute, charter provision, ordinance or regulation."

9      161.    Effective March 7, 2014, the United States adopted The Violence Against Women

10  Reauthorization Act (VAWA), which imposed new obligations on colleges and universities under its

11  Campus Sexual Violence Elimination Act (SaVE Act) provision. In 2015, Timothy P. White,

12  Chancellor for the California State University System, issued Executive Order 1097 in response to

13  the SaVE Act and related guidance from the U.S. Department of Education, Office for Civil Rights,

14  addressing Title IX of the Education Amendments of 1972.  Executive Order 1097 superseded

15  Executive Order 1074 which itself was issued in response to the April 2011 "Dear Colleague" letter

16  from the U.S. Department of Education Office of Civil Rights addressing Title IX of the Education

17  Amendments of 1972 and, like Executive Order 1097, this policy and complaint procedure applied

18  systemwide.  In accordance with policy of the California State University, the campus president has

19  the responsibility for implementing executive orders where applicable.

20      162.    Those Executive Orders identify prohibited conduct to include discrimination,

21  including harassment, because of any Protected Status: i.e., age, disability (physical and mental),

22  gender (or sex), gender identity (including transgender), gender expression, genetic information,

23  marital status, medical condition, nationality, race or ethnicity (including color or ancestry), religion

24  (or religious creed), sexual orientation, sex stereotype, and Veteran or Military Status including

25  retaliation for exercising rights under the Executive Orders, opposing discrimination or harassment

26  because of a protected status, or for participating in any manner in any related investigation or

27  proceeding, among other things.

28

163.    Under defendant CSU's Executive Order 1097, any Employee who knows or has reason to know of allegations or acts that violate the policy outlined in Executive Order 1097 had a duty to promptly inform the Discrimination/Harassment/Retaliation (DHR) Administrator or Title IX Coordinator. These Employees were required to disclose all information including the names of the Parties, even where the person has requested anonymity.  "Employee" is defined by defendant CSU's Executive Order 1097 as a "person legally holding a position in the CSU" which included full-time, part-time, permanent, tenured, probationary, temporary, intermittent, casual, and per-diem positions. The Assistant Coaches that reported to defendant DAVID WOJCIK were employees for purposes of CSU's Executive Order 1097.

164.    CSU's Executive Order 1097 is an enactment that impose mandatory, not discretionary, duties to avoid discrimination, harassment and retaliation for opposing same.  CSU's Executive Order 1097 proscriptions and duties are obligatory in its directions to the campus president of each public California State University and its Employees.  CSU's Executive Order 1097 requires compliance, rather than merely authorize or permit, that a particular action be taken or not taken. CSU's Executive Order 1097 proscriptions and duties, in direct response to the SaVE Act and related guidance from the U.S. Department of Education, Office for Civil Rights, addressing Title IX of the Education Amendments of 1972 (as its precursor was issued in response to the April 2011 "Dear Colleague" letter from the U.S. Department of Education Office of Civil Rights addressing Title IX of the Education Amendments of 1972), is an enactment designed or intended to protect against the kind of risk of injury suffered by plaintiff as the party asserting Government Code section 815.6 as a basis for liability.

165.    Government Code section 820 provides that public employees are liable to the same extent as private persons for injuries caused by their acts or omissions, unless a statute otherwise provides for immunity.

166.    Defendants SAN JOSÈ STATE, DAVID WOJCIK and TYLER OJANEN and San Josè State Spartans men's basketball team's other Assistant Coaches breached the mandatory duties set forth in CSU's Executive Order 1097 which caused plaintiff harm and which was the proximate cause of the injury suffered by plaintiff.

1    WHEREFORE, plaintiff prays for relief as hereinafter provided.

2                                    **PRAYER**

3    Plaintiff hereby prays for the following forms of relief:

4    1.    For compensatory damages in an amount according to proof;

5    2.    For special damages in an amount according to proof;

6    3.    For an order enjoining defendants, and each of them, from further failures in meeting

7    their statutory and regulatory duties as alleged herein;

8    4.    For an order requiring defendants, and each of them, to train, supervise, manage and

9    control those delegated to carry out educational functions;

10   5.    For costs of suit, including reasonable attorneys' fees; and

11   6.    For pre and post judgment interest;

12   7.    For punitive damages where allowed and according to proof; and

13   8.    For such other relief as the Court deems just and proper.

14

15   Dated: September 25, 2017              Law Offices of Frank S. Moore, APC

16

17                                         /s/
                                           _____
18                                         Frank S. Moore
                                           Attorney for Plaintiff
19

20

21

22

23

24

25

26

27

28